United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 22, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

04-30634

---

LAKES OF GUM COVE HUNTING & FISHING L.L.C.; LAKES OF GUM COVE
LAND L.L.C.

Plaintiffs - Appellants

Versus

WEEKS MARINE, INC., ET AL.

Defendants

USA

Defendant - Appellee

---

Appeal from the United States District Court for the Western
District of Louisiana, Lake Charles
No. 2:00-CV-65

---

Before KING, Chief Judge, and DAVIS, Circuit Judge, and
ROSENTHAL, District Judge.[*]

PER CURIAM:[**]

Plaintiffs Lakes of Gum Cove Hunting & Fishing, L.L.C and

Lakes of Gum Cove Land, L.L.C. (collectively "LGC") appeal the

---

[*]District Judge of the Northern District of Texas, sitting
by designation.

[**]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-1-

district court's dismissal of their trespass claims against Weeks Marine, Inc. ("Weeks") and the United States for damages allegedly resulting from the deposit of dredged material on LGC's property.  Because the district court did not err in concluding that LGC consented to the defendants' entry onto LGC's property, we affirm the district court's dismissal of plaintiffs' trespass action.

I.

In November 1998, two brothers, Anthony and Joseph Palermo, formed LGC as a Louisiana limited liability company to purchase land in Louisiana to lease for hunting and fishing.  In December 1998, LGC purchased a tract of land in Cameron Parish, Louisiana, bordering the Calcasieu River Ship Channel from Amoco Production Company ("Amoco").  Included in the purchased property was Brown Lake, which is located two miles west of the Calcasieu River and south of Lake Charles.  The deed included a provision notifying the purchaser that the land was encumbered by a "Temporary Easement or Servitude" that Amoco granted to the South Lake Charles Harbor & Terminal District ("District") so that the district could finish dredging the Calcasieu River Ship Channel.

The dredging project was part of an ongoing jointly funded state and federal project by the District and the United States Army Corp of Engineers ("ACE").  Pursuant to the Calcasieu River Ship Channel plan, dredged material from the Calcasieu River Ship Channel was deposited on adjacent land to create cells to

-2-

minimize saltwater intrusion into Brown Lake.  These deposits
were thought to have the added benefit of restoring the marshland
and improving the habitat for fish and other wildlife.  The
dredging was conducted by the DREDGE TOM JONES pursuant to a
contract between ACE and Weeks, the owner of the dredging
vessel.[1]

In April 1999, the dredging project was not completed within
the period of the original easement between the District and
Amoco.  Marc Rosamano ("Rosamano"), ACE's attorney, drafted a
temporary right of entry entitled "Right of Entry for
Construction" ("Right of Entry"), so the project could continue.
Rosamano learned that the property was now owned by LGC, and
forwarded the Right of Entry instrument to both Palermo brothers.
After receiving the document, Anthony Palermo contacted Rosamano
to discuss the dredging project.  After talking with Rosamano,
Anthony signed the Right of Entry, which granted the District and
its agents (which included Weeks and the ACE) the right to
continue depositing dredged material on LGC's property for a
period of three months under the same terms and conditions as the

---

[1]Phase I of the Calcasieu River Ship Channel plan was
completed in 1993, during which dredged material from the channel
was used to create five cells on the east side of Brown Lake.
Phase II of the project began in April 1998 according to the
easement obtained from Amoco, with the goal of creating three
cells on the west side of Brown Lake.

prior easement.[2]

The dredging project resumed on May 19, 1999, and continued until Phase II was completed on June 28, 1999. Some time after the dredging stopped, the Palermo brothers perceived a decline in the amount of fish and other wildlife around Brown Lake. Because the Palermos believed that the change was caused by the dredging activities and the deposit of dredged material on their land, they filed suit on behalf of LGC in October 1999 against Weeks, the District, and the captain of the dredging vessel. LGC alleged that, because the defendants did not obtain proper consent to enter LGC's property and dispose of the dredged material, they committed trespass and were liable for any damages resulting from their activity. According to the complaint, the dredged material deposited on LGC's property contained toxins and pollutants that severely diminished the wildlife population on the property, decreasing LGC's ability to lease the property and

---

[2]The Right of Entry provided in part:

> The undersigned, hereinafter called the "Owner," in consideration of the work to be performed...for servitude rights hereinafter described...grants an irrevocable right to enter upon the lands...any time within a period of three (3) months from the date of this instrument, or until a new servitude agreement is entered into, whichever is shorter, in order to do work necessary to locate, construct, operate, maintain, alter, repair and patrol a dredged material disposal area, under the same terms and conditions as the attached Temporary Easement or Servitude Agreement dated April 28, 1998, which the [District] and the Owner are in the process of renewing. R. 103.

generate income.  LGC later filed a separate lawsuit against the United States based on ACE's participation in the dredging activity, and the two cases were consolidated for trial.

Before trial, the district court granted ACE's motion for summary judgment and dismissed the claims against the United States as time-barred, but found that the government must indemnify Weeks for any damages Weeks was required to pay.  The court also dismissed the claims against the District and the captain of the DREDGE TOM JONES.

The main issue at trial was whether LGC consented to the defendants' entry onto LGC's property so as to defeat the trespass claims.[3]  Following the bench trial, the district court's findings first considered whether Anthony Palermo's signature on the Right of Entry instrument as an agent for LGC bound LGC to its terms.  Because both LGC entities were limited liability companies created in Louisiana, the district court determined that Anthony's ability to consent for LGC was governed by Louisiana law.  The court concluded that under Louisiana law, an individual member of an L.L.C. can bind the company for all

---

[3]In an earlier ruling the district court found that LGC's claims were properly labeled "marine trespass" claims governed by the "general common law of trespass," under which the court applied the Second Restatement of Torts.  The parties agree that the landowner's consent defeats a trespass under the Second Restatement.  See RESTATEMENT (SECOND) OF TORTS § 892A (1977) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or harm resulting from it.").

matters "in the ordinary course of business other than the alienation, lease, or encumbrance of its immovables" unless otherwise provided in the articles of organization.[4] The court concluded that if the articles of organization do not authorize an individual member to alienate, lease, or encumber company property, such actions require a majority vote of the company members.[5] The district court found that, because Anthony Palermo's signature on the Right of Entry did not purport to alienate, lease, or encumber LGC's immovable property, his lone signature was sufficient to bind LGC to the terms of the instrument, which allowed the defendants to enter the property and continue to deposit dredged material onto LGC's land. The court held that such consent to enter the property defeated LGC's trespass claims as a matter of law, and rendered judgment for the defendants. This appeal followed.

## II.

LGC argues on appeal that the district court erred in failing to classify the Right of Entry as an encumbrance under Louisiana law, thus requiring the signatures of both Palermo brothers to permit entry onto LGC's property. Because the instrument purporting to authorize the defendants to enter

---

[4]LA. REV. STAT. § 12:1317 (A). LGC's articles of organization did not purport to enhance the authority of the members to alienate, lease, or encumber company property.

[5]LA. REV. STAT. § 12:1318 (B)(5).

company property was signed by only one member of LGC, LGC argues that it was ineffective to grant defendants any right of entry.

The defendants argue that, even if the Right of Entry purported to encumber company property, evidence in the record demonstrates that both brothers consented to the defendants' entry onto LGC's property to deposit dredged material.

After reviewing the record, we agree with the defendants that the evidence is uncontradicted that both Palermo brothers consented to the defendants' entry onto LGC's property. It is therefore unnecessary for us to decide whether the Right of Entry purported to encumber LGC's property.

The record shows that both Anthony and Joseph Palermo participated in meetings in late 1998 with Clay Mitkiff, an engineer with the ACE, to discuss the dredging project on LGC's property. According to Anthony Palermo's testimony, Mitkiff showed them drawings depicting the work already done and described how the plan would create cells that would restore the marshland. Joseph Palermo testified that, after meeting with Mitkiff and several agents from the Department of Wildlife and Fisheries to discuss dredging activities at Brown Lake, Anthony was "all hipped up" by the fact that these projects would restore the marshland without any cost to the landowner.[6] Joseph stated that although he was not as excited as his brother, he went along

---

[6] 1 Tr. at 120.

with the proposed plans because he believed they would improve hunting and fishing around Brown Lake.

Anthony Palermo also testified that in May 1999, while bass fishing in Brown Lake, he observed the defendants "bumping a bunch of mud" into the middle of the marsh.[7]  He further testified that it was clear to him at that point that the defendants' dredging activities had altered the character of the marshland situated in Brown Lake.  He admitted, however, that he never contacted anyone from the District or the ACE to complain that this activity was unauthorized.

Joseph Palermo testified that he first learned that the defendants had resumed dredging operations when Anthony called him after Anthony saw the above described activity while fishing in Brown Lake.  At the time of this conversation with Anthony, Joseph stated that he knew from his earlier contacts with the defendants that they wanted to continue depositing dredged material on the property.  Shortly after Anthony's phone call informing him of the defendants' activity, Joseph flew over Brown Lake and personally observed the dredging activity.  Even after observing the defendants' activity, Joseph did not notify the defendants that their presence on LGC's property was unauthorized or demand that they stop dredging operations at Brown Lake.

On August 24, 1999, the Palermo brothers hosted a barbecue

---

[7]1 Tr. at 33-34.

at LGC's facilities for the representatives from the ACE, the District, and Weeks to discuss continuing dredging activities into "Phase III." Although both Anthony and Joseph Palermo were present at the meeting and took part in the discussions regarding further dredging activities on their company's land, neither voiced any concerns or notified any of the representatives present that their work on Brown Lake was unauthorized. To the contrary, the parties left the barbeque with a preliminary plan in place to move ahead with "Phase III" of the dredging operations at Brown Lake.

It is uncontradicted from all of the testimony that the first time the Palermo brothers notified the defendants that they objected to the defendants' activity on LGC's property was when they filed this lawsuit in October of 1999. As the only members of LGC, the Palermo brothers were the sole representatives of LGC and the only persons with whom the defendants were able to communicate about this project. The Palermo brothers' conduct before and after the dredging deposit operations clearly shows that they consented to the defendants' entry onto LGC's land.[8] This consent defeats LGC's trespass claims.

### III.

LGC also argues that any failure by the Palermos to object

---

[8]This consent is not negated by uncommunicated reservations the two brothers may have had about the effect the deposit of spoil on their land might have on hunting and fishing.

-9-

to the defendants' operations on LGC's property was the result of substantial misrepresentations from government employees to the Palermos, and renders ineffective any possible consent to their activities. LGC contends that, while meeting with the Clay Mitkiff in 1998 to discuss the dredging project, the Palermo brothers were told that the continued depositing of dredged material at Brown Lake would enhance the population of fish and other wildlife. LGC also contends that, while attempting to secure the Right of Entry to extend dredging operations, Marc Rosamano made similar predictions to Anthony Palermo. Because these misrepresentations induced them to allow the dredging project to continue, LGC argues, their consent was vitiated and their trespass claims are not precluded.

Assuming that these predictions were made, the record simply does not support a conclusion that the government representatives knew or had reason to know that these statements were inaccurate, which LGC must show to vitiate their consent in this context.[9]

---

[9]See RESTATEMENT (SECOND) OF TORTS § 892B (1977) ("If the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm."); RESTATEMENT (SECOND) OF TORTS § 173 (1977) ("The rules stated in § 892B as to consent induced by misrepresentation or mistake apply to entry or remaining on land."); RESTATEMENT (SECOND) OF TORTS § 526 (1977) (providing that a fraudulent misrepresentation occurs when "the maker knows or believes that the matter is not as he represents it to be, does not have the confidence in the accuracy of his representation that he states or implies, or knows that he does not have the

LGC concedes that the additional dredged material placed on the property from 1993 to 1999 improved hunting and fishing at Brown Lake.  There is no evidence that any of the defendants' employees knew or should have known that the deposit of additional dredged material would not continue to have the same positive effect.  In order to demonstrate that their consent was vitiated by the defendants' predictions, LGC was required to show that the defendants either intentionally or negligently misrepresented what effect the additional dredged material would have on hunting and fishing at Brown Lake.[10]  Without such evidence, LGC's consent was effective and defeats their trespass claims.

IV.

For the reasons stated above, we AFFIRM the district court's judgment in favor of the defendants.

AFFIRMED.

---

basis for his representation that he states or implies");
RESTATEMENT (SECOND) OF TORTS § 552 (1977) (providing that a negligent misrepresentation occurs when "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information").

[10] Id.